JON M. SANDS
Federal Public Defender
District of Arizona
850 West Adams, Suite 201
Phoenix, Arizona 85007
Telephone: (602) 382-2700

JANE L. McCLELLAN
Arizona State Bar No. 015902
JAMES D. RAEL
Arizona State Bar No. 034405
Asst. Federal Public Defenders
jane_mcclellan@fd.org
james_rael@fd.org
Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>vs.<br><br>Preston Henry Tolth,<br><br>Defendant. | CR-23-08043-PCT-DLR<br><br>**MOTION TO SUPPRESS STATEMENTS FOR *MIRANDA* VIOLATION AND LACK OF VOLUNTARINESS**<br><br>**(Evidentiary Hearing/Oral Argument Requested)** |

Defendant Preston Henry Tolth, by and through undersigned counsel, hereby moves to suppress his post-arrest statements made after he made an unambiguous invocation of his right to remain silent pursuant to *Miranda,* because law enforcement did not scrupulously honor his request to remain silent by approaching him again while in custody and reinitiating interrogation. *See* United States Constitution Amendment V and Title 18 U.S.C. § 3501; *see also Dickerson v. United States,* 530 U.S. 428 (2000); *Michigan v. Mosley,* 423 U.S. 96 (1975); *Miranda v. Arizona,* 384 U.S. 436 (1966). Defendant also moves to suppress his post-arrest statements because his statements were not voluntary. *See Arizona v. Fulminante,*

499 U.S. 279 (1991). This motion is more fully supported by the attached memorandum.

It is expected that excludable delay under Title 18 U.S.C. § 3161(h)(7)(B)(i) and (iv) may result from this motion or from an order based thereon.

## MEMORANDUM

### I.     Facts and Procedural History

On March 14, 2023, the Government indicted Preston Henry Tolth for two offenses: Count 1: Assault Resulting in Serious Bodily Injury, in violation of 18 U.S.C. §§ 1153 and 113(a)(6); and Count 2: Carjacking, in violation of 18 U.S.C. § 2119(2). Specifically, the Government alleges that on or about June 15, 2021, Mr. Tolth, an Indian, assaulted a woman with the initials "E.B." resulting in serious bodily injury, within the confines of the Navajo Nation Indian Reservation, and that on or about that same date, within the District of Arizona, he took a motor vehicle from E.B. by using force, violence, or intimidation and resulting in serious bodily injury to E.B.

Preston Tolth was arrested for these offenses on April 3, 2023, and he had his initial appearance in Flagstaff, Arizona, on April 4, 2023. (Dkt. 8). He was detained after a detention hearing on April 7, 2023. (Dkt. 10, 11). A firm trial date has been set for May 14, 2024. (Dkt. 30).

The investigation of this case began after E.B. was reported missing on June 15, 2021. E.B. resided in Sweetwater, Arizona, on the Navajo Nation Indian Reservation. E.B. lived alone, and her daughter, Joann Begay, lived nearby in another house. The following facts are unclear and are gleaned from the various police reports, interviews, and other discovery in this case. It is alleged that Joann Begay called the Navajo Police at approximately 2:00 a.m. on June 15, 2021, after a disturbance at her residence, and that the police arrived and found E.B.'s residence

locked. It is unclear whether there was any suspicion that E.B. was missing at that time. Later in the morning, Joann Begay was unable to get in touch with her mother, and her mother's truck was missing. Officers learned that Preston Tolth had been in the area the night before after his father dropped him off at the Sinclair gas station, which is located approximately 13.5 miles from the home of E.B. Preston Tolth was developed as a possible suspect in the disappearance of E.B. and the truck.

Preston Tolth was located in or near Thoreau, New Mexico, on or about June 18, 2021. He was arrested by the Navajo Police on charges of public intoxication and criminal nuisance and detained pursuant to a state warrant from San Juan County, New Mexico, for a probation violation. The bench warrant states that Preston Tolth was arrested and taken into custody on June 18, 2021, at 5:15 p.m. As background, according to the state docket, Mr. Tolth pleaded guilty on February 18, 2021, to a charge of aggravated assault and was placed on probation. A state warrant was issued on June 1, 2021, for a probation violation. An extradition warrant was issued by the Navajo Nation on June 18, 2021. Based on the documents, he appears to have waived an extradition hearing. One of the forms states that he requested counsel for the extradition hearing, but there is a handwritten note stating that "Im gonna voluntarily return to the State of New Mexico State," and it is dated June 8, 2021, which appears to be an error. *See* Exhibit 1: Bench Warrant and Extradition Documents (Gov. Bates Nos. 1251-55). According to the docket, Mr. Tolth did not have a hearing on the probation violation matter in New Mexico state court until July 19, 2021.

The First Interview – June 18, 2021

On June 18, 2021, while in custody at the Crownpoint Criminal Investigator's Office, Preston Tolth was interviewed by Federal Bureau of Investigation (FBI) Special Agents Chip Arrington and Dustin Drace. Also present was Navajo Criminal

Investigator Custer Bryant. Mr. Tolth was advised of his *Miranda* rights. *See* Exhibit 2: Transcript of Interview of Preston Tolth on June 18, 2021 (hereinafter "6/18/21 TR") at 5-7; *see also* Exhibit 9 (audio recording of June 18, 2021, interview). When asked if he was willing to answer questions without a lawyer, he said "Hmm, I don't know . . . But I'll . . . I'll answer some questions." 6/18/21 TR at 6. According to the form, he signed the Advice of Rights at 9:20 a.m. on June 18, 2021. Exhibit 3: FBI Advice of Rights, dated June 18, 2021 (Gov. Bates No. 000050). Mr. Tolth knew that he had been accused of "stealing a truck." 6/18/21 TR at 8. Mr. Tolth admitted to having been in Sweetwater, Arizona, about one week before, and stated that he had hitchhiked back to Thoreau, New Mexico, after getting in an argument with his father. 6/18/21 TR at 16-17. The agents falsely stated that they had witnesses in Sweetwater and Department of Transportation cameras showing him driving the truck. 6/18/21 TR at 24-27. The agents stated that there was a woman missing in Sweetwater. 6/18/21 TR at 28-29. In response to their questions, Mr. Tolth stated: "I don't know what you're talking about . . ." 6/18/21 TR at 32.  Special Agent Arrington said, "you did some stupid shit that night, Preston," and Mr. Tolth responded, "Oh, no, no, I didn't." 6/18/21 TR at 32.

They continued to press him for information, and Mr. Tolth said, "I'm done. This ain't going to get nowhere." 6/18/21 TR at 34-35. Special Agent Arrington asked, "do you want to talk to us? Do you want to tell us where [E.B.] is?" 6/18/21 TR at 35. Special Agent Arrington said that Mr. Tolth had told his brother that he got in an argument "with this girl and I probably killed her." 6/18/21 TR at 35. Mr. Tolth said: "I never said anything of that." 6/18/21 TR at 35. Special Agent Arrington continued to press him, and repeatedly told him to "stop it," and Mr. Tolth said, "No, you stop it." 6/18/21 TR at 36. The interview concluded as follows:

| | |
|---|---|
| TOLTH: | This ain't no therapy lesson, session or – I'm done. |
| ARRINGTON: | You're done with what? |
| TOLTH: | This. |
| ARRINGTON: | You don't have anything else to say? |
| TOLTH: | No, I do not. |
| ARRINGTON: | All right. |

6/18/21 TR at 38, 39. At that point, the interrogation ceased. He was arrested at 5:15 p.m. on the state bench warrant *after* he was interrogated by the FBI agents. And after the arrest, he apparently waived the extradition hearing (although he initially appears to have requested counsel). *See* Exhibit 1.

<u>The Second Interview – June 24, 2021</u>

Mr. Tolth was transferred to the San Juan County Adult Detention Center in Farmington, New Mexico. He was being held on the state warrant for the probation warrant; he had not been charged with any crime related to the vehicle theft or disappearance of E.B. He had not appeared before any judge in any court, nor had he had the benefit of the advice of counsel. On June 24, 2021, he was interviewed by FBI Special Agent Lance Roundy at the San Juan County Adult Detention Center. Mr. Tolth did not request this interview. The FBI agent initiated the contact. Special Agent Roundy acknowledged that Mr. Tolth had "kind of a rough conversation with some other FBI guys there . . . in Crownpoint." *See* Exhibit 4: Transcript of Interview of Preston Tolth on June 24, 2021 (hereinafter "6/24/21 TR") at 2. Mr. Tolth did not respond to questions at first. Special Agent Roundy said that he was not there to talk about the probation violation state charge. 6/24/21 TR at 3. Special Agent Roundy read the *Miranda* rights. When asked if he understood those rights, Mr. Tolth said, "Yes, sir." 6/24/21 TR at 4. Special Agent Roundy asked him if he wanted to talk to him, and Mr. Tolth said, "I don't know. Last time it didn't go so good." 6/24/21 TR

at 4. Special Agent Roundy continued to encourage Mr. Tolth to talk to him and eventually Mr. Tolth signed the *Miranda* waiver form. 6/24/21 TR at 6; *see* Exhibit 5: FBI Advice of Rights, dated June 24, 2021 (Gov. Bates No. 39).

Special Agent Roundy falsely claimed that they had located the pickup truck. 6/24/21 TR at 6. Special Agent Roundy stated, falsely, that things were recovered from the truck that indicated something "went awry," and he falsely claimed that they had run "a lot of tests, labs, forensics and stuff like that"  6/24/21 TR at 7, 9, 45. Special Agent Roundy said that the U.S. Attorney's Office could prosecute him for a homicide charge, "which carries with it a pretty big penalty." 6/24/21 TR at 7. He told Mr. Tolth that a first-degree murder charge "has a mandatory life in prison" sentence. 6/24/21 TR at 7-8.

After making these false statements about the status of the investigation and the evidence and telling Mr. Tolth that he could face murder charges, Mr. Tolth finally began answering questions. He admitted to taking a truck and driving to New Mexico. 6/24/21 TR at 10. Mr. Tolth stated that he got in a fight with his father who left him at the side of the road. 6/24/21 TR at 10. He received a ride from someone and then walked the rest of the way to the house where he got the truck. 6/24/21 TR at 12, 15. He said that he went to the house of his father's girlfriend's sister. 6/24/21 at 15, 16. (His father, Leonard Tolth, is in a relationship with Cecilia B., who is the sister of E.B.) Notably, neither the agent nor Mr. Tolth ever referred to the alleged victim by name during this interview. Preston Tolth said that she was drunk and bothering him, so he left her "in the middle of nowhere." 6/24/21 TR at 17, 18. He said that where he left her, there were people drinking outside. 6/24/21 TR at 23. Mr. Tolth said that "maybe I hit her." 6/24/21 TR at 22. He said that he may have hit her four times; he may have hit her on the nose. 6/24/21 TR at 47-48, 62. He said he went to New Mexico and met his brother, Leander, and then they "sold that truck for

dope." 6/24/21 TR at 33-34. When asked if the woman may have died, he said no. 6/24/21 TR at 53. He said that she was on her feet when she got out of the truck. 6/24/21 TR at 55. He said: "I don't know what happened to her." 6/24/21 TR at 55, 60.

<u>The Third Interview – July 13, 2021</u>

On July 13, 2021, FBI Special Agent Roundy picked up Mr. Tolth, who was still in custody at the San Juan County Adult Detention Center, and took him in a vehicle to travel to the area of Sweetwater, Arizona, where the events took place on June 15, 2021, and to have him retrace his steps (referred to as the "escort trip"). *See* Exhibit 6: Transcript of Escort of Preston Tolth on July 13, 2021(part 1) (hereinafter "7/13/21 TR (part 1)"); *see also* Exhibit 7: Transcript of Escort of Preston Tolth on July 13, 2021 (part 2). Special Agent Roundy reviewed an Advice of Rights form with Mr. Tolth who signed the form. *See* Exhibit 8: FBI Advice of Rights, dated July 13, 2021 (Gov. Bates No. 000078). During the escort trip, Mr. Tolth explained his route, and he repeated that he hit the woman. 7/13/21 TR (part 1) at 12. He told the agents where he thought that he had dropped her off. 7/13/21 TR (part 1) at 13. Based on prompts from the agents, Mr. Tolth repeated much of his statement from June 24, 2021. 7/13/21 TR (part 1) at 12-16, 23. There are two recordings of the escort trip on July 13, 2021, and the first recording contains the majority of the interrogation. There are four audio recordings of the interviews, which Defendant is filing separately for the Court's review (Exhibits 9, 10, 11, and 12).

**II.    Defendant's Statements Made on June 24 and July 13, 2021, Must Be Suppressed Because He Invoked His Right to Silence and the Agents Did Not Scrupulously Honor His Rights When They Reinitiated Further Interrogation**

The Fifth Amendment to the United States Constitution provides that "[n]o person shall be compelled in any criminal case to be a witness against himself." In *Miranda v. Arizona,* 384 U.S. 436 (1966), the Supreme Court sought to protect this

crucial right against compelled self-incrimination by adopting prophylactic measures ensuring that a suspect is advised of his Fifth Amendment rights before being subjected to a custodial interrogation. *See United States v. Craighead,* 539 F.3d 1073, 1082 (9th Cir. 2008); *see also Dickerson v. United States,* 530 U.S. 428 (2000). When an accused is in custody and subject to interrogation, law enforcement must first advise that person of his *Miranda* rights, and the person being questioned must make a valid waiver of those rights before he can be questioned. The government has a heavy burden to show that a defendant's waiver of *Miranda* rights was proper. *See, e.g.*, *United States v. Rodriguez,* 518 F.3d 1072, 1079 (9th Cir. 2008) (*citing Miranda,* 384 U.S. at 475).

Simply because an accused responds to police-initiated interrogation after he has been advised of his rights does not mean that the accused has made a valid waiver of those rights. *See Edwards v. Arizona*, 451 U.S. 477, 484 (1981). A determination of whether a waiver is voluntary, knowing, and intelligent requires a reviewing court to discern whether "the waiver [was] made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it." *Colorado v. Spring*, 479 U.S. 564, 573 (1987). The interrogating law-enforcement officers should obtain a clear and unequivocal waiver before asking questions. *See Rodriguez*, 518 F.3d at 1079 n.7.

In *Michigan v. Mosley*, the United States Supreme Court examined the issue of when it is permissible to interrogate a suspect after he has invoked his right to silence. 423 U.S. 96, 100 (1975). In that case, the Court held that the "admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Id.* at 104 (*quoting Miranda*, 384 U.S. at 474). In *Mosley*, the Court focused on the following factors when it found that the police had

scrupulously honored the defendant's "right to cut off questioning": an interval of more than two hours passed after the invocation of his right to silence; the defendant was given a fresh set of *Miranda* warnings; the subject matter of the second interrogation   (a homicide) was entirely unrelated to the subject of the first interrogation (robberies unrelated to the homicide). *Id.* at 104-05. The Court also noted that the first interrogation was brief. *Id.* at 106. The Court concluded that this was not a case where police officers persisted in "repeated efforts to wear down his resistance and make him change his mind." *Id.* at 105-06.

Mr. Tolth was in custody and subject to interrogation on June 18, on June 24, and on July 13, 2021. Preston Tolth clearly invoked his right to silence on June 18, 2021, when he stated, "I'm done," and responded to the question about whether he had anything else to say by stating: "No, I do not." 6/18/21 TR at 38-39. *See United States v. Reid,* 211 F. Supp. 2d 366, 369, 374 (D. Mass. 2002) (defendant's statement: "I have nothing else to say" – was a clear assertion of his right to silence). This is supported by the fact that the agents immediately ceased the interrogation. *See id.* at 374 (fact that investigators declined to ask any further questions suggests they perceived his statement as an assertion of his right to remain silent). Therefore, the question for the Court here is whether the re-initiation of interrogation on June 24, 2021, adhered to the requirements of *Miranda* and *Mosley.*

After the *Mosley* decision, the courts have grappled with how to determine whether the police have "scrupulously honored" the right to silence. The Ninth Circuit approach "takes account of all relevant circumstances" as do other circuits where no one factor is dispositive. *See, e.g., United States v. Hsu*, 852 F. 2d 407, 410 (9th Cir. 1988) (discussing factors for determining a violation pursuant to *Mosley*; finding no violation where officer conducting second interrogation was unaware that defendant had invoked right to silence when arrested at the scene); *see also United*

*States v. Schensow*, 151 F.3d 650, 658-59 (7th Cir. 1998) (discussing multi-factor tests for determining violation and noting that the focus is on whether the police "sought to undermine the suspect's resolve to remain silent"). In *United States v. Barone*, the First Circuit noted that one of the distinctions between the cases where statements were suppressed after resumed interrogation versus those where the statements were not suppressed was that "in several cases where the right to remain silent was held not to have been scrupulously honored, the circumstances lead to a conclusion that the police resumed questioning for no other reason than to induce the defendant to change his mind." 968 F.2d 1378, 1385 n.9 (1st Cir. 1992) (*quoting Vujosevic v. Rafferty*, 844 F.2d 1023, 1029 (3d Cir. 1988)).

The length of time between the interrogations is a factor to consider under *Mosley*. In *Reid*, the court observed that "[t]he length of time that a suspect remains in custody before the police reinitiate questions can cut both ways under *Mosley*. On one hand, if the police recommence interrogation too soon after the suspect invokes the right to silence, it may suggest that the police attempted to badger the suspect out of his silence. . . . On the other hand, if the police detain a suspect for too long prior to questioning, a court may conclude that the police utilized the coercive effect of incarceration to convince the suspect to speak." *Reid*, 211 F. Supp.2d at 376 n.7 (*citing Barone*, 968 F.2d at 1385-86 (one factor for suppression was that "the prolonged detention magnified the inherent coercion of being held in custody" where the defendant had not been arraigned in a timely manner)).

Another factor for the Court to consider is whether threats, such as the possibility of charges being filed or discussions about prison conditions, were made by the police to induce the defendant to talk. In *Barone*, police officers told the defendant that he would be in "substantial danger" if he returned to Boston without cooperating with authorities. *Id.* at 1380-81. In *United States v. Olof*, the agent told

the defendant that he would advise the prosecutor of his cooperation and confronted him with a description of prison as a "dark place" where they "pumped air to the prisoners." 527 F.2d 752-54 (9th Cir. 1975) (internal quotations omitted) (one of the agents was aware that the defendant had previously refused to give a statement three hours earlier and advised the defendant again of his *Miranda* rights; the court found that defendant's rights were violated based on several factors).

Another factor discussed in some cases is whether the police confronted the defendant with additional evidence to induce the defendant to talk. For example, in *Barone*, during the time period when the defendant first invoked his rights and when he finally agreed to talk, the police talked to an additional witness and used this information to pressure the defendant into cooperating. 968 F.2d at 1381, 1386 (holding that the police had not scrupulously honored his right to remain silent and suppressing statements). In *Barone*, the officers used accurate information to encourage the defendant to answer questions, but the Court noted that "the use of false or deceptive information certainly would count in the balance *against* the government." *Barone,* 968 F.2d at 1385 n.10 (*citing Vujosevic*, 844 F.2d at 1030)).

In *Vujosevic*, the defendant had refused to give a statement on three separate occasions, but when confronted with false information about his brother's involvement, he agreed to waive his rights and give a statement. 844 F.2d at 1029 ("they essentially bluffed him into agreeing"). There also was evidence presented in *Vujosevic* that the police were concerned that the defendant would be arraigned soon and assigned an attorney. *Id.* at 1030. The Court also noted the fact that the defendant had not initiated the conversation where he waived his rights. *Id.* at 1025, 1028-29; *cf. United States v. Davis*, 421 F. Supp. 3d 433, 448-49 (E.D. Ky. 2019) (defendant changed his mind and reinitiated further conversation when he asked to talk in a more private setting; defendant's *Miranda* rights not violated). Under these

circumstances, the Court in *Vujosevic* concluded that his rights had not been scrupulously honored and the confession was suppressed. 844 F.2d at 1030.

One of the most basic *Mosley* factors to consider is whether the second interrogation was on the same or a different topic. In *Olof*, the statement was suppressed, in part, because "[t]he two interrogations were based on the same crime and the object of the second interrogation was to wear down Olof's resistance and make him change his mind." 527 F.2d at 754; *see also United States v. Barnes*, 432 F.2d 89, 90-91 (9th Cir. 1970) (holding that statements violated *Miranda* where two defendants invoked right to silence and later confronted by police with incriminating information "for the obvious purpose of getting defendants to abandon their self-imposed silence").

In light of these factors, there are several reasons why law enforcement violated Mr. Tolth's rights when it reinitiated interrogation on June 24, 2021. The Court must consider the interval of time between the first and second interrogations. At first blush, it may appear that a sufficient amount of time had passed before the second interrogation in this case. Indeed, it was a period of approximately six days – far more than the two hours that elapsed in *Mosley.* However, the courts have recognized that the length of time is not dispositive and that a protracted period of incarceration can have an inherently coercive effect. *See Reid*, 211 F. Supp. 2d at 376 n.7. Preston Tolth had been held in continuance custody during this period of time on an unrelated charge – a probation violation. He had not had the benefit of consulting with counsel nor had he appeared before any judge or court. Mr. Tolth had not been charged with any offense related to the instant federal offenses.

Another key consideration is what had transpired (and what had not transpired) during that period of time and why the agent re-approached Mr. Tolth. Prior to interrogating Mr. Tolth on June 18, 2021, agents had interviewed Preston's

brother, Leander Tolth, on June 17, 2021, and Leander Tolth provided information about Preston's alleged involvement in the instant offenses. The agents interviewed Preston Tolth on June 18, 2021, and he invoked his right to silence. On the same date, the agents re-interviewed Leander Tolth and obtained some additional details regarding the alleged offenses. It is unclear whether the interview of Preston Tolth on June 18 was before or after the June 18 interview of Leander Tolth. Between the June 18 and June 24 interviews, law enforcement had not located the vehicle or conducted any forensic testing. They had not obtained any Department of Transportation data as they claimed.

The interview itself clearly shows that FBI Special Agent Roundy was aware that Mr. Tolth had invoked his right to silence. 6/24/21 TR at 2 ("I know that, boy, last week you had kind of a rough conversation with some other FBI guys there"). Although it was a different agent who was interviewing him, Special Agent Roundy appears to have been working together with the other FBI agents. He was aware of the prior interview. *Cf. Hsu*, 852 F.2d at 410 (officer unaware that defendant had previously invoked).

Mr. Tolth remained silent for the first several minutes of the interview on June 24. When asked if he wanted to talk, he said: "I don't know. Last time it didn't go so good." 6/24/21 TR at 4. Mr. Tolth said: "I'll listen to what you have to say." TR 6/24/21 at 5. He was advised of his *Miranda* rights and signed the form. However, he remained silent for several minutes. Special Agent Roundy proceeded to lie and say that the government had evidence that it in fact did not have (the truck; tests; labs; forensics) and raised the possibility of first-degree murder charges and a sentence of life in prison. He implied that cooperation might help him and told him how a charge of voluntary manslaughter would not be as serious and that he wanted to present his story to the U.S. Attorney's Office. 6/24/21 TR at 9. Clearly, Special

Agent Roundy was confronting Mr. Tolth with fictional incriminating evidence and threats of serious charges of first-degree murder in an attempt to get him to abandon his right to remain silent.

In general, the police are permitted to lie about the state of the evidence, but this presentation of false evidence and threats of murder charges cuts against a finding that the police were honoring his right to remain silent. *See, e.g.*, *Olof*, 527 F.2d at 753-54 (threats about prison); *Barone*, 968 F.2d at 1385 n.10 (false evidence).

The Court should also consider that the first interrogation on June 18, 2021, was not a brief interrogation. The agents talked to Mr. Tolth for approximately 29 minutes. *See* Exhibit 9. He was asked many questions about his whereabouts during the relevant time period. *See, e.g.*, 6/18/21 TR at 10-25. The agents told him that a woman was missing from Sweetwater, and they made false statements regarding the state of the evidence. 6/18/21 TR at 24-28. This is not a case where there was a very brief interrogation where a defendant invokes his rights followed by a second thorough interrogation. *Cf. Mosley*, 423 U.S. at 106; *Hsu*, 852 F.2d at 409 (defendant arrested at the scene of the crime, read his *Miranda* rights and invoked his right to remain silent after a few questions; he was questioned later by an officer who was unaware that he had invoked his rights).

Lastly, the subject matter of the interrogations was in regard to the exact same offenses, which is a factor that supports a finding that law enforcement did not scrupulously honor his right to silence. *Mosley,* 423 U.S. at 104-05; *see also Michaels v. Davis*, 51 F.4th 904, 925 (9th Cir. 2022) (after invoking his right to silence, police continued asking questions and asked him for his "side of the story;" statements suppressed). Here, Special Agent Roundy advised Mr. Tolth of his *Miranda* rights again, but the clear purpose of the interrogation was to convince Mr.

Tolth to abandon his right to silence. Mr. Tolth did not reinitiate the interrogation; he initially appears to have not wanted to engage or talk with the agent; and it is only after being advised that he might be charged with first-degree murder and that there was (fictitious) incriminating evidence against him, that he agreed to answer questions.

For all of these reasons, Defendant submits that his statements made on June 24, 2021, should be suppressed, and that all subsequent statements made on July 13, 2021, must also be suppressed. The subsequent statements are similar to the situation in *Missouri v. Seibert*, where the Court held that statements given after *Miranda* warnings were not admissible when the defendant had previously been interrogated without the benefit of *Miranda* warnings. 542 U.S. 600 (2004) (plurality opinion). During the escort trip on July 13, 2021, the agents basically repeated Mr. Tolth's statements and asked him to confirm those statements, thus it is a continuation of the previous interrogation with the same investigating officers. *Seibert*, 542 U.S. at 615. Mr. Tolth still had not had the benefit of counsel, and those statements should be suppressed for the same reasons that the June 24, 2021, statement should be suppressed.

**III.   Mr. Tolth's Statements to Law Enforcement Must Be Suppressed Because They Are Not Voluntary**

The government has the burden of proving that a confession is voluntarily given. *See Arizona v. Fulminante*, 499 U.S. 279, 288 (1991). Pursuant to 18 U.S.C. § 3501(a), the trial judge must determine whether a confession was made voluntarily. An involuntary statement is not admissible because it is inherently untrustworthy, and its use violates a fundamental sense of decency. *See Spano v. New York*, 360 U.S. 315, 320-21 (1959). A statement is involuntary if the will of the defendant "was overborne in such a way as to render his confession a product of coercion," and thus it is inadmissible under the Fifth Amendment, Due Process Clause. *Id.*; *see also*

*United States v Bautista-Avila*, 6 F.3d 1360, 1364 (9th Cir. 1993) (stating that "[a] statement is involuntary if it is extracted by any sort of threats or violence [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence") (internal citations omitted).

Section 3501(b) sets forth criteria for determining whether a statement is voluntary: (1) the time elapsing between arrest and arraignment, if the statement was made after arrest and before arraignment; (2) whether the defendant knew the nature of the offenses with which he was charged or was suspected of committing at the time he made the statement; (3) whether he had been advised of his *Miranda* rights; and (4) whether defendant was without the assistance of counsel when he was questioned and made the statement. No one of these factors is dispositive of whether a confession is voluntary, but rather they must be viewed under the totality of the circumstances. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) (listing circumstances that may affect a determination of voluntariness). The determination of voluntariness includes consideration of the defendant's personal history, level of education attainment, physical condition, and the circumstances in which law-enforcement officers elicited the statement. *See Crane v. Kentucky*, 476 U.S. 683, 691 (1986).

Here, Defendant submits that his statements were not voluntarily made because his will was overborne rendering his confession a product of coercion. Mr. Tolth was 22 years old at the time he was questioned. He does not have a high school diploma. He has a long history of substance abuse and mental health issues. He was incarcerated for about one week prior to making incriminating statements and was without the benefit of counsel. As explained above, Special Agent Roundy told him that he could be charged with first-degree murder and lied about the state of the evidence against him. Thus, his *Miranda* rights were not honored. These tactics were

coerce and thus his statements were not voluntary. For these reasons, his statements made on June 24, 2021, and July 13, 2021, must be suppressed.

**IV.    Conclusion**

For all of the foregoing reasons, Defendant respectfully requests that his statements be suppressed. Defendant expects that further facts would be developed at an evidentiary hearing regarding the circumstances surrounding Defendant's statements. Therefore, Defendant respectfully requests that an evidentiary hearing be held to determine whether his statements were elicited in violation of *Miranda* and whether his statements were voluntary.

Respectfully submitted:   April 8, 2024.

JON M. SANDS
Federal Public Defender

 *s/ Jane L. McClellan*
JANE L. McCLELLAN
Asst. Federal Public Defender