GARY M. RESTAINO
United States Attorney
District of Arizona
TRACY VAN BUSKIRK
Arizona State Bar No. 022097
ALANNA R. KENNEDY
Arizona State Bar No. 034257
Assistant U.S. Attorneys
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona 85004
Telephone: 602-514-7500
Email: vinnie.lichvar@usdoj.gov
Email: tracy.van.buskirk@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| United States of America, | No. CR-23-08043-001-PCT-DLR |
|---|---|
| Plaintiff, | **GOVERNMENT'S NOTICE OF INTENT TO USE EXPERT TESTIMONY RE: DNA AND SEROLOGY** |
| vs. | – AND – |
| Preston Henry Tolth, | **REQUEST FOR DEFENSE NOTICE AND DISCOVERY** |
| Defendant. | |

Pursuant to Federal Rule of Criminal Procedure 16(a)(1)(G) and Federal Rules of Evidence 702, 703, 704, 705, and 1006, the government provides notice that the following witness will give testimony that may be construed as falling within the purview of these rules. This expert will offer opinion testimony based upon her training, experience, and education as set forth in her curriculum vitae (CV). To the extent she has authored a report or recorded her actions in case notes, her testimony is expected to be consistent with that report and case notes and to include all facts, observations, and conclusions therein. The government reserves the right to offer additional testimony by this expert, and for the expert

to amend her opinion by considering additional information perceived by or made known to her before or during trial.

## I. **Expert**

    1.    <u>Constance Fisher, Biologist/Forensic Examiner DNA and Serology</u>

The United States intends to offer the expert opinions of Constance Fisher from the Federal Bureau of Investigation (FBI) DNA Casework Unit (DCU) regarding DNA evidence that was tested in this case. [Laboratory Report dated September 7, 2023.] Ms. Fisher's report and most recent CV were previously disclosed to the defense.

### A. Expected Testimony

Ms. Fisher may explain how evidence is inventoried, stored and tested at the FBI Laboratory. She will explain the steps she took after she was assigned evidence to analyze. As one of the assigned Forensic Examiners, she reviewed the evidence and developed the examination plan. After Ms. Fisher developed the examination plan for some of the items of evidence (some items were examined by another examiner), biologists processed the items at her direction.

At trial, Ms. Fisher may provide general background information regarding forensic DNA testing and will describe/define deoxyribonucleic acid (DNA), how DNA varies from person to person, how DNA may or may not transfer from its original source to another person and or object, and what factors may affect the quality and/or quantity of DNA detected. She will testify that when evidence is received at the FBI Laboratory for DNA analysis, a team of biologists process the evidence in accordance with the Standard Operating Procedures of such tests, the results of which are then reviewed by the Forensic Examiner in the DNA Casework Unit assigned to the case, to ensure no additional testing is needed.

Ms. Fisher may explain the sequence of testing that items go through at the FBI lab and how that sequence may impact testing in the DNA lab.

Ms. Fisher will provide her expert opinion that from the samples submitted to her for analysis, some DNA profiles were recovered, as more specifically outlined below. Ms.

Fisher will describe the processes used to recover those profiles, which include collection, extraction, quantitation, amplification, analysis, and interpretation. She will also describe the individualizing characteristics used to conduct a DNA analysis—i.e., short tandem repeats, how DNA typing is performed at the FBI lab and the possible outcomes of a DNA examination. She will also explain how a DNA profile is interpreted, what factors may affect such interpretation, and the process for determining the number of contributors to an evidentiary profile.

Ms. Fisher determined that the DNA profiles developed in this case were suitable for comparison and compared these DNA profiles using the applicable Quality Assurance Manual and Standard Operating Procedures in place at the time at the FBI Laboratory, calculated statistics, and documented her conclusions in a written report. She will describe how such comparisons were performed and what possible conclusions may be reached in performing forensic DNA examinations in accordance with the United States Department of Justice Uniform Language for Testimony and Reports.[1] More specifically, the results to which Ms. Fisher will testify regarding the examinations she conducted in this case are contained within her Laboratory Reports of Examination. Specifically, she will testify with regard to her examinations and/or comparisons for the following items of evidence:

- Buccal sample from Preston Tolth (Lab Item #1)
- Bottle with cap from outside residence of Joann Begay (Lab Item #22)
- Can from inside residence of Joann Begay (Lab Item #23)
- Toothbrush submitted as known sample from victim (Lab Item #29)
- Wearer swabbing of shirt from next to washing machine (Lab Item #3)

Ms. Fisher may testify that the steps involved for DNA analysis often begin with serology testing. Biologists test samples for the presence of blood or semen, using generally accepted tests. The evidence is first visualized for the presence of stains. If a stain is seen, the serologist tests the stain, by collecting it with a swab and then adding the chemicals

---

[1] *See* Department of Justice Uniform Language for Testimony and Reports. https://www.justice.gov/olp/uniform-language-testimony-and-reports.

used for the presumptive test. These presumptive tests are very sensitive for blood.

If an evidentiary sample is of a sufficient quantity, a confirmatory blood test can be performed. The test used in the FBI lab for this purpose is called a Takayama test and is also generally accepted in the scientific community for this purpose.[2] A small portion of the sample is placed on a slide, chemicals are added, and if crystals form, the test is positive, and the sample is confirmed to be blood. A negative Takayama test does not mean that the sample is not blood. Indeed, the Takayama test is not as sensitive as the presumptive test and the sample may be insufficient to yield positive confirmatory results. In some cases, the serologist will not attempt a Takayama test because the sample size is not sufficient ("QNS" means "quantity not sufficient") or a discretionary decision is made not to test ("NFC" means "not further characterized"), and the sample is saved and used for DNA testing.

Ms. Fisher will testify some samples do not undergo any serology, like known buccal swabs. In these cases, the first step is not serological testing, but rather collection. Generally, the collection step is as the name implies, the attempt to collect cellular material from evidence. Collection of stains from evidentiary samples may include swabbing or cutting the item and preparing it for the next steps (i.e., a gun might be swabbed, portions of fabric might be cut and saved, and portions of swabs might be cut). In the collection process, biologists label each tube with a unique barcode, which is used to track chain of custody throughout the examination process and is used by various instruments for tracking purposes throughout processing.

After items are prepared for DNA testing and labeled with a unique barcode, the next step is extraction. The biologist adds chemicals to break open the cells containing DNA. The barcoded tubes are scanned and placed into a robot, which washes away all cellular debris from the samples, resulting in a liquid DNA extract. A control sample, called a reagent blank, is included in this stage. This is a quality assurance protocol that enables

---

[2] This test is no longer used by the FBI lab.

the Forensic Examiner to independently ensure the integrity of the DNA extraction reagents and all reagents used throughout the remainder of processing, regardless of whether she is physically present for this step.

Ms. Fisher will testify that the next step is quantitation, to determine the amount of DNA present. In this step, biologists prepare the deck of a liquid-handling robot by scanning and placing barcoded sample tubes, filling reservoirs with the appropriate reagents, and providing a sample plate (also called a tray) that is also electronically tracked by barcode. The robot prepares the quantitation sample plate, and a biologist moves the barcoded plate to the instrument that performs the quantitation test. The quantitation instrument uses a polymerase chain reaction (PCR) to measure how much DNA is present. The data is forwarded to the Forensic Examiner for both quality assurance purposes and to prepare the samples for the next step in the process.

The next step is amplification, where millions of identical copies are made of the DNA sections of interest for forensic DNA analysis. Biologists prepare the samples for amplification, similar to the process used in quantitation, which generates a barcoded amplification plate, to which some of the DNA is added. The amplification plate is moved to the instrument that performs the amplification.

Once amplification is complete, biologists remove the amplification plate from the instrument and prepare it for the final step in DNA processing, separation (capillary electrophoresis). The amplification plate is moved to another liquid-handling robot for the creation of a barcoded daughter plate (or separation plate). The separation plate is created with capillary electrophoresis chemicals and the amplified product from the amplification plate. Biologists place the prepared barcoded separation plate onto an instrument for denaturation (heating and cooling). Then the separation plate is placed on an instrument that separates out the DNA fragments by size, making it possible to visualize the DNA profile in a way conducive to data interpretation. Following the separation process, biologists upload the raw data produced by the instrument to the network for Ms. Fisher to access and analyze with the assistance of a software program. Each sample has a file and

is imported by Ms. Fisher into analysis software: GeneMapper ID-X. Ms. Fisher analyzes and interprets the data with the assistance of the software program, and authors a report with her conclusions.

Much of the above steps involve batch runs, allowing multiple samples to be processed by the lab at the same time, all as set forth in lab protocols and as generally accepted in the scientific community. Controls and quality assurance measures are employed to include negative controls, blank controls, positive controls, and measuring ladders all as set forth in the quality assurance manuals and standard operating procedures.

While DNA typing of evidentiary samples does not identify the type of cellular material (e.g., blood, saliva, sweat), reasonable inferences can be made as to the cellular identity. For example, an item that has tested presumptively for blood and where the DNA is identified as coming from a single source may have come from the blood. If it did not come from the blood, then one would question, "where did it come from?" and "where is the DNA from the blood?" Ms. Fisher will also testify that the DNA testing used in the FBI lab is human specific.

Mitochondrial DNA testing was conducted for the sole purpose of entering the results into CODIS, it was not used for comparison.

Ms. Fisher will testify as to both the statistical and non-statistical implications of the data in this case. To determine the likelihood ratios in this case, Ms. Fisher used the probabilistic genotyping software program called STRmix™. She will explain that the DNA profile(s) developed in this case were imported into the STRmix™ software, which calculates a statistical value called a "likelihood ratio."[3] For an inclusion, the likelihood

---

[3] A likelihood ratio (LR) is a statistic for the comparison of the probability of the evidence (E), given two competing propositions. The inclusionary proposition (H1), includes the person of interest and, for mixed samples, known and/or unknown, unrelated individuals. The total count of individuals included in the proposition is equal to the number of contributors interpreted to be in the sample. The exclusionary proposition (H2) generally consists of unknown, unrelated individuals, equaling the total number of contributors interpreted to be in the sample. See *Department of Justice Uniform Language for Testimony and Reports for Forensic Autosomal DNA Examinations Using Probabilistic Genotypic Systems.* December 12, 2022.

ratio describes how much more likely it is to obtain the DNA results if the person of interest is a contributor to the DNA profile, rather than if an unknown, unrelated person is a contributor to the DNA profile. She will further explain that the FBI Laboratory uses a qualitative verbal scale to describe the strength of support that likelihood ratio provides to the conclusion. She may explain that the Scientific Working Group on DNA Analysis Methods (SWGDAM) recommends these supplementary verbal qualifiers, which are reflected in the FBI Standard Operating Procedures.[4] Ms. Fisher may also explain that the STRmix™ software has been thoroughly validated, both developmentally by the manufacturer and internally by the FBI Laboratory prior to its use in forensic casework, and the software is used widely within the forensic community which means that numerous laboratories have tested the STRmix probabilistic genotyping software and found it to reliably produce accurate results. In addition, she may testify that the use of STRmix™ has been subject to extensive peer-reviewed publications. She may testify that the internal parameters and the protocol for using STRmix™ were developed based upon the FBI Laboratory's internal validation studies and can be found in the FBI Laboratory Procedures. Ms. Fisher will testify that she used STRmix™ in accordance with those procedures, which was verified by another qualified Forensic Examiner during the technical review process.

### B. Bases and Reasons

Ms. Fisher's opinions are based on her personal examination of the results, which were produced in her case file materials, as well as her training, education, experience, and expertise in the areas of forensic serology, DNA and mitochondrial DNA. Ms. Fisher's expert forensic opinions, and the bases for those opinions, are guided by Standard Operating Procedures and applicable Quality Assurance Manual and set forth more fully in her report. Ms. Fisher may also rely on peer-reviewed literature, presentations given and attended, and continuing education to provide context to the DNA results—e.g., transfer,

---

[4] Recommendations of the SWGDAM Ad Hoc Working Group on Genotyping Results Reported as Likelihood Ratios. https://www.swgdam.org/publications.

persistence, and recovery of DNA profiles on items of evidence.

### C. Qualifications Including Publications

As set forth in her CV, Ms. Fisher has served as a Biological Laboratory Technician (Serologist) and Biologist/ Forensic Examiner at the FBI Laboratory in Quantico, Virginia since 1997. From 1991 to 1996, she worked as a Senior Staff Fellow at the Laboratory of Molecular Oncology, and before that, she worked as a Postdoctoral Fellow at the National Jewish Center for Immunology and Respiratory Medicine (1988-1991). Ms. Fisher graduated with a Bachelor of Science degree in Biochemistry from Pennsylvania State University in 1982, and a Ph.D. in Biochemistry from the University of North Carolina in 1988. Ms. Fisher has authored one publication in the last ten years as set forth in her most recent CV.

### D. Prior Testimony

As set forth in her CV, Ms. Fisher has testified as an expert witness approximately 60 times since January 1999. In the last four years, Ms. Fisher has testified as an expert witness in the following cases (at trial, hearing or deposition):

| Date | Case Name |
|------|-----------|
| 2020 | United States v. Joshua Jackson (D.Md.) |
| 2020 | Republic of Palua v. Remoket (Supreme Court of Republic of Palau) |
| 2021 | Texas v. Suzanne Rivera (10th Judicial District Court, Galveston) |
| 2021 | Florida v. Michael Zuiten (20th Judicial Circuit, Collier County) |
| 2022 | Illinois v. Allen Castleberry (Circuit Court of Macoupin County) |
| 2022 | Alabama v. Chad Brogdon (Circuit Court of Dale County) |
| 2022 | Georgia v. Jordan (Oglethorpe County Superior Court) |
| 2022 | United States v. Stallworth (N.D.Ala.) |
| 2022 | United States v. Brown (N.D.Ala.) |
| 2023 | Florida v. George Moraiau (Pinellas County Circuit Court) |

| 2023 | *Arizona v. Amber Langley* (Superior Court of Arizona, Graham County |
| 2024 | *Georgia v. Teresa Black* (DeKalb County Superior Court) |
| 2024 | *Texas v. Nikolle Aguilar* (226th District Court of Bexar County) |

*Constance Fisher* (signature)
Constance Fisher
FBI DCU

2. <u>Biologists from the DCU</u>

In the FBI's DCU, biologists also play a role in the DNA analysis process. As noted above, when evidence is received, Forensic Examiners, in this case Constance Fisher and Alan Giusti, determine which items will be tested, which examinations will be performed, and the appropriate workflow for examinations. A team of biologists processes the evidence in accordance with the directions of the Forensic Examiner and the Standard Operating Protocols of such tests. Biologists keep detailed notes and work closely with the Forensic Examiner as items are processed. When testing is completed, the Forensic Examiner is responsible for data analysis, interpretation, and authoring a report detailing her conclusions. The steps performed by the biologists may include serology, collection, extraction, quantitation, amplification, and separation (capillary electrophoresis), as more fully detailed above and within the aforementioned discovery and case notes.

In this case, Constance Fisher and Alan Giusti are the Forensic Examiners.[5] The biologists involved in pertinent laboratory examinations are Stacey Campbell, Patricia Kramer, Maragret Waldron, Melissa Ramirez, Jordan Flesher, Lily Wong, and Zachary Curran. These biologists may be called to testify about the role each played with respect to different items of evidence referenced in the aforementioned report and Forensic Examiner Giusti's report.

---

[5] A separate notice of expert testimony was filed for Alan Giusti (Doc 50).

The qualifications for each of the above biologists are detailed in their respective CVs, which will be produced shortly.

## II. Request for Discovery

Once the government complies with the defendant's request for disclosure of reports of examinations and tests pursuant Fed. R. Crim. P. 16(a)(1)(F), the defense must, upon request, provide a summary of its expert witness testimony. Fed. R. Crim. P. 16 (b)(1)(C). Therefore, the government requests all discovery under Rule 16(b)(1)(C), including: a complete statement of all opinions that the defendant will elicit from the witness in the defendant's case-in-chief, and the bases and reasons for them; the witness's qualifications, including a list of all publications authored in the previous 10 years; and, a list of all other cases in which the witness has testified as an expert at trial or deposition within the last 4 years.

Respectfully submitted this 11th day of April, 2024.

GARY M. RESTAINO
United States Attorney
District of Arizona

s/Tracy Van Buskirk
TRACY VAN BUSKIRK
ALANNA R. KENNEDY
Assistant U.S. Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing a copy to the following CM/ECF registrants: James Rael and Jane McClellan, Attorneys for Defendant